UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
NORTHERN DIVISION



FILED
MAR 0 4 2009

******************************************************************

ROGER MOHLING and ROBERT PARRY,

Plaintiffs,

-vs.-

FARM BUREAU MUTUAL INSURANCE
COMPANY d/b/a/ FARM BUREAU
FINANCIAL SERVICES,

Defendants.

CIV 07-1019

MEMORANDUM OPINION
AND ORDER

******************************************************************

Plaintiffs filed an amended complaint contending that defendant terminated their employment on November 30, 2006, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. Defendants filed a motion for summary judgment (Doc. 26), contending that plaintiffs were not employees of the defendant within the meaning of the ADEA.

## DECISION

**I. Summary Judgment Standard.**

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Donaho v. FMC Corp., 74 F.3d 894, 898 (8th Cir. 1996). The United States Supreme Court has held that:

> The plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "A material fact dispute is genuine if the evidence is sufficient to allow a reasonable jury to return a verdict for the non-moving party." Landon v. Northwest Airlines, Inc., 72 F.3d 620, 634 (8th Cir. 1995). In considering the motion for summary judgment, this Court must view the facts in the

light most favorable to plaintiffs and give plaintiffs the benefit of all reasonable inferences that can be drawn from the facts. Donaho, 74 F.3d at 897-98. The ultimate issue of whether plaintiffs were employees or independent contractors may be one of law which may properly be resolved by summary judgment but only where there is no genuine issue of material fact. Lerohl v. Friends of Minn. Sinfonia, 322 F.3d 486, 488 (8th Cir. 2003).

## II. Employee vs. Independent Contractor.

Under the ADEA, it is "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The ADEA protects employees who are at least forty years old. *See* 29 U.S.C. § 631.

> The determination of employment status is a mixed question of law and fact. Normally, a judge will be able to make this determination as a matter of law. However, where there is a genuine issue of fact or conflicting inferences can be drawn from the undisputed facts, as here, the question is to be resolved by the finder of fact in accordance with the appropriate rules of law.

Jenkins v. Southern Farm Bureau Casualty, 307 F.3d 741, 742 (8th Cir. 2002) (*quoting* Lilley v. BTM Corp., 958 F.2d 746, 750 n. 1 (6th Cir. 1992)).

The United States Supreme Court has held that, when construing the term "employee" in a federal statute, we apply the general common law of agency to determine whether an individual is an employee or an independent contractor. Nationwide Mutual Insurance Co. v. Darden, 503 U.S. 318, 319, 112 S.Ct. 1344, 1346, 117 L.Ed.2d 581 (1992) (ERISA). The Eighth Circuit applied the Darden rule in construing the term "employee" as used in the ADA, 42 U.S.C. § 12101, Birchem v. Knights of Columbus, 116 F.3d at 310, 312 (8th Cir. 1997) and Lerohl v. Friends of Minnesota Sinfonia, 322 F.3d 486, 489 (8th Cir. 2003), Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, Wilde v. County of Kandiyohi, 15 F.3d 103, 105 (8th Cir. 1994), and the ADEA, Wortham v. American Family Ins. Group, 385 F.3d 1139, 1140 (8th Cir. 2004).

The Supreme Court set forth in Darden a non-exhaustive list of factors to be considered in determining whether a worker is a covered employee or a non-covered independent contractor:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the

2

manner and means by which the product is accomplished. Among the other
factors relevant to this inquiry are the skill required; the source of the
instrumentalities and tools; the location of the work; the duration of the
relationship between the parties; whether the hiring party has the right to
assign additional projects to the hired party; the extent of the hired party's
discretion over when and how long to work; the method of payment; the
hired party's role in hiring and paying assistants; whether the work is part
of the regular business of the hiring party; whether the hiring party is in
business; the provision of employee benefits; and the tax treatment of the
hired party.

Nationwide v. Darden, 503 U.S. at 323-234, 112 S.Ct. at 1348. Those factors are derived from Restatement (Second) of Agency § 220(2) (1958).

I have reviewed a number of Eighth Circuit cases dealing with insurance agents and have set forth below a compilation of the Darden factors as they apply to this case.

1. Whether defendant is in business.
2. Whether the plaintiffs' work is part of the defendant's regular business.
3. Whether plaintiffs are insurance professionals, that is, possessing the skill required to perform professional activities.
4. Whether plaintiffs signed an agreement expressly identifying them as independent contractors.
5. Whether plaintiffs were prevented from contracting with any other insurance company to sell insurance.
6. Whether defendant supervised the day-to-day activities of plaintiffs or whether plaintiffs had discretion over when to work and how to perform their jobs.
7. Whether defendant had the right to control the manner and means by which plaintiffs sold insurance and managed their accounts.
8. Whether defendant had the right to assign additional projects and duties to plaintiffs.
9. Whether plaintiffs worked out of an independent office, hired their assistants or paid office-related expenses, used their own or the defendant's computer system -- that is, the source of their tools.
10. Whether plaintiffs were subject to defendant's employee policies including formal hour or leave policies, sexual harassment policies, and other policies.
11. Whether defendant required plaintiffs to maintain acceptable errors and omissions coverage.
12. Whether plaintiffs were paid by salary or commission.
13. Whether plaintiffs received employee benefits such as participation in defendant sponsored insurance or retirement programs.
14. Whether plaintiffs received W-2 or 1099 tax forms showing earnings.
15. Whether plaintiffs paid their own employment taxes.

Wortham v. American Family Ins. Group, 385 F.3d 1129, 1140-41 (8th Cir. 2004); Schwieger v. Farm Bureau Ins. Co. of Neb., 207 F.3d 480, 484 (8th Cir.2000); Jenkins v. Southern Farm Bureau Cas., 307 F.3d 741, 742-43 (8th Cir. 2002), and Birchem v. Knights of Columbus, 116 F.3d 310, 313 (8th Cir. 1997).

### 1. Whether the defendant is in business.
### 2. Whether the plaintiffs' work is part of defendant's regular business.

It is undisputed that defendant is in the business of selling insurance. It is undisputed that plaintiffs were hired to sell insurance for defendant. In fact, plaintiffs contend that they were "captive agents." They were prohibited by the terms of their contract with defendant from selling insurance products for any other company without Farm Bureau approval. This factor weighs in favor of a finding that the plaintiffs were employees. Schwieger v. Farm Bureau, 207 F.3d at 486.

### 3. Whether plaintiffs are insurance professionals.

There is no dispute that plaintiffs are licensed insurance professionals. They are licensed by the State of South Dakota at their own expense and have several certifications from various insurance professional organizations. That, in and of itself, would not require a finding that they are independent contractors. Many lawyers and accountants are also licensed professionals but are employees of their firms. Schwieger concluded that the mere fact that insurance agents are licensed professionals weighs in favor of a finding that they are independent contractors. Defendant provides some of the continuing education and training required of plaintiffs to maintain their licenses and requires that its agents attend certain training through Farm Bureau rather than through an independent training course. Further, defendants designate what licenses plaintiffs must maintain (life, health, auto, securities). Finally, defendant required its agents to be trained in specific products from Wellmark, Equitrust, and Western Ag. Insurance. These additional facts distinguish this case from Schwieger. I do not believe this factor weighs in favor of either finding.

**4. Whether plaintiffs signed an agreement expressly identifying them as independent contractors.**

It is undisputed that, on January 14, 2003, Mohling and Parry signed written agreements with Farm Bureau which included the following language:

> INDEPENDENT CONTRACTOR. It is the intent of the parties hereto that for all purposes and in all situations governed by the provisions of this agreement, Career Agent will be, and is hereby declared to be, an independent contractor and not an employee, and that the relationship between Career Agent and Company created by this agreement, will be governed by those rules of law governing the status and relationships with independent contractors and not those rules of law governing employer - employee relations. Accordingly, Career Agent has the right to control the activities and means by which the provisions of this agreement are carried out, the right to exercise independent judgment as to the persons from whom applications for insurance policies will be solicited, and the right to determine the time, place, and manner of soliciting and servicing policyholders of the Company.
>
> If training courses, sales methods and material or similar aids and services are extended or made available to the Career Agent, it is agreed that the purpose and effect thereof will not be to give the Company control over the Career Agent's time or direction or control over the manner or means by which he will conduct his business, but only to assist the Career Agent in his business.

Plaintiffs contend that the terms of this agreement were not negotiable. In June and July 2003, Mohling and Parry signed another contract with Farm Bureau, containing identical language as above but which removed the time limit on the non-solicitation provision of the contract. The terms of this agreement, according to plaintiffs, were non-negotiable. In May 2006, Mohling and Parry signed two written amendments to the contract, neither of which changed the independent contractor provisions. Again, plaintiffs contend that the terms of the amendments were non-negotiable. Whether or not the terms were negotiable is irrelevant.

"The existence of a contract referring to a party as an independent contractor does not end the inquiry, because an employer 'may not avoid [the ADEA] by affixing a label to a person that does not capture the substance of the employment relationship.'" Schwieger v. Farm Bureau,

5

207 F.3d at 483 (*quoting* Devine v. Stone, Leyton & Gershman, P.C., 100 F.3d 78, 81 (8th Cir.1996)).

**5. Whether plaintiffs were prevented from contracting with any other insurance company to sell insurance.**

Farm Bureau agents could not sell insurance products for any other insurance company without the approval of Farm Bureau. Agents were not prevented from having other non-insurance employment. However, plaintiffs contend that if an agent was not meeting company goals, Farm Bureau would direct the agent to cease supplemental employment. Upon termination, agents were prohibited from soliciting insurance business in any county where they had sold or serviced Farm Bureau products.

Under current South Dakota law, covenants not to compete are lawful both for employees and for independent contractors who are captive insurance agents. *See* SDCL 53-9-11 and 53-9-12. However, in 2003 when the contracts at issue in this case were first drafted and executed, covenants not to compete were lawful only in the context of an employer/employee relationship. SDCL 53-9-9 (2003). South Dakota Farm Bureau was one of the proponents of the legislation allowing covenants not to compete in employment relationships. In order for the covenants not to compete to be lawful in 2003, plaintiffs must have been employees of defendant. This factor weighs in favor of a finding that the plaintiffs were "employees" for the purposes of the federal anti-discrimination laws.

**6. Whether defendant supervised the day-to-day activities of plaintiffs or whether plaintiffs had discretion over when to work and how to perform their jobs.**

Although Farm Bureau did not tell Mohling and Parry when to be in the office or out of the office, Farm Bureau did monitor the amount of time agents were spending in their offices with clients. Agents were required to submit weekly reports showing client contacts to Farm Bureau which reports were used to evaluate the agents' performance and which the managers used to assign books of business to the agents. Plaintiffs assert that an agent's accounts (and thus commissions) could be taken away if the agent did not meet expectations. The parties dispute whether agent expectations were set by Farm Bureau management or by the agent. The parties dispute whether office hours were 8-5 because defendant expected agents to keep those office

6

hours. Farm Bureau contends that any expectations were actually "industry requirements." I have no idea what that means. I doubt that there is any such requirement.

When Parry became an agent in 2002, he was assigned a book of business in Watertown. He could expand his book of business by selling existing clients new types of insurance or by seeking out clients who had no previous business with Farm Bureau.

When plaintiffs were initially assigned to the Watertown office, a Farm Bureau manager initially came bi-weekly but only twice a year thereafter. However, plaintiffs contend that "Riley was present in Parry's office on a weekly basis by computer."

Under South Dakota law, supervision of the day-to-day activities of the agents would favor a finding that the agents are under the control of the defendant company. *See* Egemo v. Flores, 470 NW2d 817, 822 (SD 1991).

**7. Whether defendant had the right to control the manner and means by which plaintiffs sold insurance and managed their accounts.**

Agents could make telephone calls to whomever they chose. However, according to plaintiffs, those calls were monitored by defendant. Further, defendant controlled whom plaintiffs could write policies of insurance for - defendant alone determined whether the agent could make the sale and earn the commission. For example, farms were subject to defendant's "pre-inspection approval" before an agent could offer to write insurance for the farm.

Agents chose whether to participate in community service activities in order to solicit clients. However, plaintiffs contend that defendant evaluated agents based upon the public's perception of the agent. All correspondence was evaluated by the defendant.

Agents could choose to place advertisements in the Yellow Pages but had to choose from among defendant's pre-approved ads. Agents' ads were strictly reviewed for content. All office signage had to be pre-approved by defendant. Even give-away items (pens, mugs) had to be approved. Farm Bureau paid for 50% of the agents' ads and sometimes actually placed the ads for the agents. The script of any radio ads had to be pre-approved by Farm Bureau. Defendant claims, without citation to any authority, that approval was required to comply with securities laws.

This factor weighs in favor of a finding that the agents are employees.

**8. Whether defendant had the right to assign additional projects and duties to plaintiffs.**

Plaintiffs contend that defendant had the right to assign the block of insurance that an agent would sell. Defendant also dictated what additional licenses an agent must acquire so that the agent could sell additional insurance products for defendant (i.e., life, health, securities). This factor weighs in favor of a finding that the agents are employees.

**9. Whether plaintiffs worked out of an independent office, hired their assistants or paid office-related expenses, used their own or the defendant's computer system -- that is, the source of their tools.**

When Mohling began his relationship with defendant in 1989, defendant provided all equipment, office furniture, phone, secretarial staff, and forms required to conduct business. Although the parties did not so state, I assume that, when Mohling became a manager, defendant provided the same. Though not specifically stated, I assume Parry's relationship in 1988 with defendant as an agent was similar to Mohling's.

When Mohling left management and again became an agent in 2001 or 2002, he worked in Brookings, South Dakota. During the last three years of his employment, he worked out of Watertown, South Dakota. His office location was dictated by the "book of business," i.e., the accounts assigned to him by his manager. Mohling did not establish his own office but rather worked out of existing offices in those cities. He split the cost of rent with another agent in the Brookings office. Mohling contends that he did not make an independent decision to do so but rather was "assigned" to do so. Farm Bureau owned the office equipment and paid the secretary's salary and telephone bills in the Brookings office.

When Farm Bureau insisted that agents sign the "independent contractor" agreement in 2003, Mohling and the other agent in the Brookings office were required to purchase the office equipment, furniture, and telephone system from Farm Bureau or return the furniture to Farm Bureau. The agents began paying for their own telephone service. They also paid for their own office supplies, pop, water, and postage. After Farm Bureau depreciated out the furniture in the Watertown office, Parry was required to purchase it or ship it back to Farm Bureau. He purchased it.

When plaintiffs were agents, they used their own automobiles and paid for their own gasoline and other vehicle and maintenance expenses. However, Mohling's travel was required as a result of being "assigned" to cover accounts in Watertown while he was working out of the Brookings office. When he moved to the Watertown office, Mohling's office arrangements were the same as in Brookings after 2003 - the agents paid for everything.

When Parry was assigned to the Watertown office in 2002, the previous agent had already left. The remaining agent abruptly left the day after Parry arrived. Thereafter, Parry signed a lease for that office space. While Parry and Mohling were agents in Watertown, they also paid the utilities.

All staff hired after Mohling signed the 2003 agreement had to be screened, fingerprinted and approved by Farm Bureau. Farm Bureau contends, without citation to any authority, that screening, fingerprinting, and approval were required by the "industry." Some staff were required by Farm Bureau to sign non-compete agreements. The secretary was an employee of Mohling and the agent with whom he shared office space and they paid her salary.

Farm Bureau agents were required to have a computer and related software which they leased from Farm Bureau. Agents were connected to Farm Bureau's mainframe computer and had an account. Farm Bureau had access to the agents' passwords. Agents paid for their own Internet connection but, according to plaintiffs, Farm Bureau monitored and restricted the Internet sites agents could visit from the leased computer (e.g., ESPN).

The source of the tools of trade, computer, insurance applications forms, insurance policies, and computers used to make rate quotes, were all owned by defendant. The agents provided all other "office" arrangements, that is, rent, utilities, staff. These factors go both ways but are matters to be considered in reaching a conclusion.

**10. Whether plaintiffs were subject to defendant's employee policies including formal hour or leave policies, sexual harassment policies, and other policies.**

Defendant requires its agents to comply with defendant's anti-sexual harassment policy. Further, defendant "evaluated" its agents based upon their relationships with Farm Bureau home office staff and other agents, public perceptions about the agent, the agent's attitude, business practices and hygiene. The fact that an agent is evaluated at all weighs in favor of an employment

relationship. Defendant denies that its agents were evaluated and "employment" decisions made based upon those evaluations. Thus, genuine issues of fact exist.

The agents did not have to keep track of vacation, sick leave, or personal leave. However, plaintiffs contend that agents were expected to schedule their leave around scheduled Farm Bureau activities. Agents were required to attend meetings set up by the manager which could interfere with leave. Defendant denies all these claims. Genuine issues of material fact exist as to this factor.

**11. Whether defendant required plaintiffs to maintain acceptable errors and omissions coverage.**

Although not required by law, Farm Bureau required its agents to carry errors and omissions coverage. Farm Bureau negotiated and obtained the coverage for its agents. Farm Bureau paid for the coverage but deducted the cost of the coverage from the agents' commissions. When defendant terminated plaintiffs, they apparently contacted the errors and omissions insurance company to terminate plaintiffs' coverage. Plaintiffs did not terminate their coverage.

Agents were also required to apply for and be accepted as participants in Farm Bureau's Blanket Position Bond. Plaintiffs did not pay for this coverage and did not personally apply for this coverage. The bond defines "employees," "agents," and "independent contractors." In other words, Farm Bureau agents were not considered independent contractors for the purposes of the bond. Farm Bureau also maintained liability coverage related to its oversight and direction of the performance of its agents.

This factor favors a finding that the agents were employees.

**12. Whether plaintiffs were paid by salary or commission.**

When Mohling began his relationship with defendant in 1989, he was paid on commission only. In 1993, Mohling became an assistant manager and his duties changed from selling insurance to recruiting and training agents. He was paid a salary for these services. In 1996, Mohling was "promoted" to the position of manager with Farm Bureau. He continued to be paid a salary. In 2001 or 2002, Mohling chose to leave his management position and returned to selling insurance for defendant as an agent.

When Parry began his relationship with defendant in 1988, he was paid on a commission basis. In 1991, Parry became an assistant manager and received a salary. He became a manager in

1993 during which time he received a salary plus commissions based upon the performance of the agents he supervised. In 2002, Parry left his management position and again became an agent.

Plaintiffs were paid strictly on commission during the time that they acted only as insurance agents. This factor weighs in favor of a finding that plaintiffs were independent contractors.

**13. Whether plaintiffs received employee benefits such as participation in defendant sponsored insurance or retirement programs.**

Farm Bureau did not pay for health, vision, dental, disability, or life insurance for the agents. The agents could voluntarily join an association to obtain such group benefits but the agents had to pay the premium. The agents were not covered under defendant's workers compensation coverage. Defendant contends that they did not provide coverage for unemployment insurance benefits for its agents.

When Mohling was an agent, he was allowed to contribute to a Farm Bureau sponsored group 401(k) retirement program, although he was not required to do so. When he left management and went back to being an agent, he was allowed to "roll over" his then "management" 401(k) plan into the "agents" plan.

Farm Bureau has a retirement plan which Farm Bureau agents can participate in after two years of service to Farm Bureau as agents. Farm Bureau matches a percentage of the agent's earnings and such funds were deposited into a company sponsored mutual fund, variable annuity, or flexible premium deferred annuity or the funds were utilized to purchase FBL Financial Group, Inc. stock. Independent contractors do not have such benefits.

This factor weighs in favor of a finding that plaintiffs were employees.

**14. Whether plaintiffs received W-2 or 1099 tax forms showing earnings.**

**15. Whether plaintiffs paid their own employment taxes.**

After plaintiffs changed from being managers to an agents in 2001 and 2002, they began receiving 1099 tax forms. On the 2006 1099, their income was shown to be "nonemployee compensation." Farm Bureau did not withhold any taxes from the earnings paid to its agents. These factors weigh in favor of a finding that the plaintiffs were independent contractors. However, it is not a controlling factor since the Courts would not allow companies to escape the force of employment laws by the manner in which they choose to pay their workers.

## III. Conclusion.

"[F]ederal courts have consistently held that insurance agents are unprotected independent contractors." Birchem v. Knights of Columbus, 116 F.3d at 313. However, the inquiry "is fact intensive, and all facts concerning performance and work situation should be analyzed." Jenkins, 307 F.3d at 742.

The Eighth Circuit's discussion in Lerohl v. Friends of Minnesota Sinfonia, 322 F.3d 486 (8th Cir. 2003) is instructive in this case:

> Like the sculptor in Reid, Sinfonia musicians such as Lerohl and Hanson are highly skilled professionals who own their own instruments and need no on-the-job training other than rehearsals to perform in a variety of musical settings. Obviously, professional musicians have the option of becoming employees of a particular band or orchestra. The record in this case suggests that is true of the musicians who play for the Minnesota Orchestra, the St. Paul Chamber Orchestra, and the Minnesota Opera. But other musicians may prefer to remain "free-lance," committing themselves fully to no client and retaining the discretion to pick and choose among available engagements, much like lawyers, accountants, and business consultants who choose private practice instead of "in-house" employment.
>
> Our cases applying the common-law agency test have recognized this freedom-of-choice principle in determining whether a skilled professional was an employee or an independent contractor in a particular case. In our view, this is the relevant control issue, not whether Fishman could tell Lerohl and Hanson where to sit and when to play during a concert or a rehearsal. Thus, the "key distinction" is whether Sinfonia musicians retained the discretion to decline particular Sinfonia concerts and play elsewhere.

*Id.* at 491.

Plaintiffs' situation is somewhat similar to the musicians. They are professionals who may either practice their trade "in-house" as employees or remain "free-lance." The difficulty in this case is that plaintiffs were not like lawyers or accountants who choose which clients to "sell" their professional services to and which services to provide. Plaintiffs could only sell insurance to those clients defendant agreed to insure. Further, plaintiffs could only sell defendant's insurance products. Genuine issues of material fact exist as to whether "[t]he hiring party's right to control the manner and means of the worker's product," Birchem v. Knights of Columbus, 116

12

F.3d at 313, exists to such an extent that, for the purposes of the ADEA, plaintiffs were employees of defendant.

The motion for summary judgment should be denied.

## ORDER

Now, therefore,

IT IS ORDERED that the motion, Doc. 26, for summary judgment is denied.

Dated this 4th day of March, 2009.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: Barbara J. Paephe
DEPUTY
(SEAL)